**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GEORGE A. HEDICK, JR., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 19-cv-1339 |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| THE KRAFT HEINZ COMPANY, et. al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| IRON WORKERS DISTRICT COUNCIL (PHILADELPHIA AND VICINITY) RETIREMENT AND PENSION PLAN, et al., | ) ) ) ) | |
| | ) | Case No. 19-cv-1845 |
| Plaintiffs, | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| v. | ) | |
| | ) | |
| THE KRAFT HEINZ COMPANY, et. al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| TIMBER HILL LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19-cv-2807 |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| THE KRAFT HEINZ COMPANY, et. al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

This is a securities class action against The Kraft Heinz Company, Bernardo Hees, Paulo Basilio, and David H. Knopf. Six movants requested that the Court consolidate the above-captioned cases and sought appointment as lead plaintiff in this matter: (1) Michael Guzzi,

Cam Hung Diep, and James Tarsy [40]; (2) The New York City Fund (the "NYC Fund") [46]; (3) Earl Chesson, The Chesson Limited Partnership, and Earl G. Chesson Revocable Tryst U/A DTD 4/11/2017 (together, the "Chesson Group") [49]; (4) Arca Investments and Krupa Global Investments (together, the "Arca/Krupa Group") [52]; (5) Sjunde AP-Fonden ("AP7") and Union Asset Management Holding AG ("Union") (together, the "AP7/Union Group") [57]; and (6) Timber Hill LLC ("Timber Hill") [61]. The motion by movants Michael Guzzi, Cam Hung Diep, and James Tarsy was terminated as moot after they filed a motion to withdraw. [See 80.] Before the Court are the remaining lead plaintiff motions [46; 49; 52; 57; 61]. Also before the Court are the AP7/Union Group's motion [106] for discovery, the AP7/Union Group's motion [114; 115] for leave to file a sur-reply to address arguments that it contends that the NYC Fund raised for the first time in its reply brief, the NYC Fund's motion [130] to take judicial notice of the master agreement between the New York City Law Department and Kessler Topaz Meltzer & Check, LLP dated February 8, 2019, and various motions to seal [103; 112; 117; 125; 129; 134].

For the reasons set forth below, the Court consolidates the above-captioned cases. The Court further grants the lead plaintiff motion of the AP7/Union Group [57] and approves the selection of Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz") and Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz") as co-lead counsel. The Court denies the remaining lead plaintiff motions [46; 49; 52; 61] in full. The AP7/Union Group's motion [106] for discovery, the AP7/Union Group's motion [114; 115] for leave to file a sur-reply, and the NYC Fund's motion [130] to take judicial notice are denied as moot. The motions to seal [103; 112; 117; 125; 129; 134] will be referred to the assigned magistrate judge for disposition. The case is set for further status hearing on October 22, 2019 at 9:00 a.m.

# I.  Background

The above-captioned actions arise from alleged violations of the Securities Exchange Act of 1934 (the "Exchange Act") and related rules and regulations by The Kraft Heinz Company ("Kraft-Heinz" or the "Company"), Bernardo Hees, Paulo Basilio, and David H. Knopf (collectively, the "Defendants").  Defendant Kraft Heinz manufactures and markets food and beverage products in the United States, Canada, Europe, and internationally.  [1, at ¶ 7.]  Kraft Heinz is a Delaware corporation maintaining its co-headquarters in Chicago, Illinois.  [*Id.*]. Kraft Heinz's securities trade on the NASDAQ under the ticker symbol "KHC."  [*Id.*]

On July 2, 2015, Kraft Heinz was formed through the merger of Kraft and Heinz.  [*Id.* at ¶ 28.]  Prior to the merger, Kraft was a publicly-traded company and Heinz was jointly owned by Berkshire Hathaway Inc. and 3G Global Food Holdings, L.P., a subsidiary of 3G, a Brazilian-American multibillion-dollar investment firm.  [*Id.*]  According to the complaint in the *Iron Workers* action, in conjunction with the formation of Kraft Heinz, on April 10, 2015, Heinz filed a preliminary registration statement and prospectus on Form S-4 with the SEC, with respect to the shares of Heinz common stock to be issued to Kraft shareholders pursuant to the merger agreement. [Case No. 19-cv-01845, Dkt. 1, at ¶ 3.]  The Form S-4 praised the merger, stating that the benefits included "enhanced competitive and financial position, increased diversity and depth in its product line and geographic areas * * * and the potential to realize, according to Heinz management, an estimated $1.5 billion in annual cost savings from the increased scale of the new organization, the sharing of best practices and cost reductions by the end of 2017."  [*Id.*]  Moreover, the Form S-4

highlighted "3G Capital's strong track record in achieving significant cost reduction and margin improvement in companies under its management." [*Id*.].

Under the terms of the merger, each share of outstanding Kraft common stock was converted into the right to receive one share of common stock of Kraft Heinz common stock. [*Id*. at ¶ 32.] Additionally, Kraft declared a special cash dividend equal to $16.50 per share of Kraft common stock to shareholders of Kraft. [*Id*.] The aggregate special dividend payment of approximately $10 billion was funded by an equity contribution by Berkshire and 3G. [*Id*.] Over the next several years, Kraft Heinz continually touted its cost cutting initiatives while simultaneously indicating its plans to grow overall revenue numbers. [*Id*. at ¶ 4.] At no time between 2015 and late 2018 did Kraft Heinz suggest its brands were impaired in a material way. [*Id*.]

On February 21, 2019, after the market closed, Kraft Heinz announced its earnings for the fourth quarter of 2018. [1 at ¶ 34.] The Company announced an impairment charge of $15.4 billion, stating, in relevant part:

> During the fourth quarter, as part of the Company's normal quarterly reporting procedures and planning processes, the Company concluded that, based on several factors that developed during the fourth quarter, the fair values of certain goodwill and intangible assets were below their carrying amounts. ***As a result, the Company recorded non-cash impairment charges of $15.4 billion to lower the carrying amount of goodwill in certain reporting units, primarily U.S. Refrigerated and Canada Retail, and certain intangible assets, primarily the Kraft and Oscar Mayer trademarks.*** These charges resulted in a net loss attributable to common shareholders of $12.6 billion and diluted loss per share of $10.34.

[*Id*.] That same day, Kraft Heinz disclosed that it had received a subpoena from the Securities and Exchange Commission in October 2018 in connection with the Company's procurement function, stating in relevant part:

> ***The Company received a subpoena in October 2018 from the U.S. Securities and Exchange Commission (the "SEC") associated with an investigation into the***

4

*Company's procurement area, more specifically the Company's accounting policies, procedures, and internal controls related to its procurement function, including, but not limited to, agreements, side agreements, and changes or modifications to its agreements with its vendors.*

Following this initial SEC document request, the Company together with external counsel launched an investigation into the procurement area. In the fourth quarter of 2018, as a result of findings from the investigation, the Company recorded a $25 million increase to costs of products sold as an out of period correction as the Company determined the amounts were immaterial to the fourth quarter of 2018 and its previously reported 2018 and 2017 interim and year to date periods. Additionally, the Company is in the process of implementing certain improvements to its internal controls to mitigate the likelihood of this occurring in the future and has taken other remedial measures. The Company continues to cooperate fully with the U.S. Securities and Exchange Commission.

[*Id.* at ¶ 35.] Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Kraft securities publicly traded on NASDAQ during the class period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures. [*Id.* at ¶ 39.] Six movants originally sought to be appointed lead plaintiff. Currently pending before the Court are the remaining motions for appointment as lead plaintiff and various other related motions.

## II.     Legal Standard

The Private Securities Litigation Reform Act of 1995 ("PSLRA") provides guidelines for the appointment of a lead plaintiff in a securities class action case. The PSLRA requires that the Court "appoint as a lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of the class members[.]" 15 U.S.C. § 78u–4(a)(3)(B)(i). The PSLRA establishes a rebuttable presumption that the "most adequate plaintiff" is the "person or group of persons" who "has either filed the complaint or made a motion in response to a notice," "has the largest financial interest in the relief sought by the class," and "otherwise satisfies the requirements of Rule 23 of the Federal Rules of

Civil Procedure." 15 U.S.C. 78u–4(a)(3)(B)(iii)(I)(aa); (bb); and (cc). This presumption may be rebutted, however, if a member of the purported class establishes that the "presumptively most adequate plaintiff will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)(aa) and (bb). The PSRLA further provides that the "most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u–4(a)(3)(b)(v).

## III.    Analysis

### A.    Consolidation

All movants initially moved to consolidate the above-captioned actions under Federal Rule of Civil Procedure 42(a). Under that rule, "[i]f actions before the court involve a common question of law or fact, the court may * * * consolidate the actions[.]" Fed. R. Civ. P. 42(a)(2). "By far the best means of avoiding wasteful overlap when related suits are pending in the same court is to consolidate all before a single judge." *Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 839 (7th Cir. 1999). Furthermore, the PSLRA provides that "[i]f more than one action on behalf of a class asserting substantially the same claim or claims arising under this title has been filed," courts shall not appoint a lead plaintiff until "after the decision on the motion to consolidate is rendered." 15 U.S.C. § 78u-4(a)(3)(B)(ii). "In securities actions where the complaints are based on the same public statements and reports, consolidation is appropriate if there are common questions of law and fact and the parties will not be prejudiced." *Weltz v. Lee*, 199 F.R.D. 129, 131 (S.D.N.Y. 2001) (citation omitted); see also *Taubenfeld v. Career Educ. Corp.*, 2004 WL 554810, at *1 (N.D. Ill. Mar. 19, 2004) ("The court agrees that consolidation is appropriate for the six related cases

insofar as each involves class action claims on behalf of purchasers of CEC stock and each asserts similar if not overlapping claims for relief.").

After initially asking that the above-captioned cases be consolidated, in its opposition brief, Timber Hill asks that the Court not consolidate the *Timber Hill* class action with the *Hedick* and *Iron Workers* common stock and notes class actions. Instead, Timber Hill contends that the cases only should be coordinated for discovery and pretrial purposes. To the extent that Timber Hill's motion [61] asks that the Court consolidate the above-captioned cases, the motion is withdrawn. Still, the remaining movants also have moved for consolidation. And Timber Hill fails entirely to explain why consolidation is inappropriate under the governing standards addressed above. The complaints here are based on the same challenged conduct and there are common questions of law and fact. Furthermore, no party has identified any prejudice that would result from consolidating these actions. Accordingly, the Court grants the pending motions [46; 49; 52; 57] to consolidate the above-captioned cases.

### B.  Presumptive Most Adequate Plaintiff

Movants the NYC Fund, the Arca/Krupa Group, and the AP7/Union Group seek to be appointed lead plaintiff in the above-captioned cases.[1] The PSLRA presumes that the most adequate plaintiff is the plaintiff who—in addition to satisfying other requirements—has the largest financial interest in the relief sought by the class. "The largest financial interest provision seeks to increase the likelihood that institutional investors will serve as lead plaintiffs by requiring courts to presume that the member of the purported class with the largest financial stake in the relief sought is the most adequate plaintiff. The PSLRA, however, does not specify how courts

---

[1] Although Movants Timber Hill and the Chesson Group initially sought to be appointed lead plaintiff for all the above-captioned cases, they now only seek to be appointed lead plaintiff for derivatives investors. The Court addresses that request below.

should measure the largest financial interest in the relief sought by the class." *City of Sterling Heights Gen. Employees' Ret. Sys. v. Hospira, Inc.*, 2012 WL 1339678, at *1 (N.D. Ill. Apr. 18, 2012) (internal citation and quotation marks omitted).

Most courts consider: "(1) the total number of shares purchased during the class period; (2) the net shares purchased during the class period (in other words, the difference between the number of shares purchased and the number of shares sold during the class period); (3) the net funds expended during the class period (in other words, the difference between the amount spent to purchase shares and the amount received for the sale of shares during the class period); and (4) the approximate losses suffered." *Hospira, Inc.*, 2012 WL 1339678, at *4 (citing *Lax v. First Merch. Acceptance Corp.*, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997)); see also *In re Cendant Corp. Litig.*, 264 F.3d 201, 263 (3d Cir. 2001) ("[W]e agree with the many district courts that have held that courts should consider, among other things: (1) the number of shares that the movant purchased during the putative class period; (2) the total net funds expended by the plaintiffs during the class period; and (3) the approximate losses suffered by the plaintiffs." (citations omitted)). While courts differ on the precise weight to apply to each factor, most courts agree that fourth factor—the approximate losses suffered—is the most salient factor in selecting the lead plaintiff. See *In re CMED Sec. Litig.*, 2012 WL 1118302, at *3 (S.D.N.Y. April 2, 2012) ("In giving weight to the four factors, courts in this District, as others, place the most emphasis on the last of the four factors: the approximate losses suffered by the movant above any weight accorded to net shares purchased and net expenditures." (citations and quotations omitted)); *In re Diamond Foods, Inc. Sec. Litig.*, 281 F.R.D. 405, 408 (N.D. Cal. Mar. 20, 2012) (concluding that the "fourth factor, 'approximate loss,' is generally considered the most important factor"); *Canson*

*v. WebMD Health Corp.*, 2011 WL 5331712, at *2 (S.D.N.Y. Nov. 7, 2011) (concluding that "[t]he fourth factor, loss suffered, weighs most heavily in the court's analysis" (citation omitted)).

The movants still being considered for appointment as lead plaintiff claim the following losses during the Class Period:

| Movant | Claimed Financial Interest[2] |
|--------|------------------------------|
| NYC Fund | $59,257,707.77 |
| Arca/Krupa Group | $22,839,506.00 |
| AP7/Union Group | Tens of Millions |

Although the NYC Fund claims the largest sum of financial losses, other movants argue that its financial interests are overstated.

Specifically, the Arca/Krupa and the AP7/Union Groups argue that the shares of Kraft Heinz that the NYC Fund acquired in the merger of Kraft and Heinz in July 2015 are not properly part of this case. The Arca/Krupa and the AP7/Union Groups argue that merger shares should be excluded because they do not fall within the scope of the Class Period, which starts on July 6, 2015 for the purposes of these motions. According to these movants, the NYC Fund acquired the merger shares on July 2, 2015, not on July 6, 2015. The NYC Fund responds by asserting that "it is hornbook law that shares acquired in a merger are considered a "purchase" under Section 10(b) of

---

[2] The parties in this case have quantified their respective financial interests in terms of their approximate losses suffered. Although the NYC Fund also quantified its losses in terms of the other factors sometimes considered by courts, as noted above, approximate losses suffered is the most salient factor in assessing the lead plaintiff. Absent a compelling reason for focusing on the other factors considered by courts, the Court uses the approximate losses claimed by each of the remaining movants as the measure of each movant's respective financial interest. Furthermore, because the NYC Fund does not provide calculations of the remaining factors excluding merger shares, the Court is forced to use the losses analysis, as the Court will not independently adjust the movants' calculations.

the Exchange Act." [99, at 16 (citations omitted).] However, that argument begs the question. The Court recognizes that "[w]hen an exchange of shares facilitates the merger of two separate and distinct corporate entities, that exchange constitutes a 'purchase or sale' for purposes of bringing a Rule 10b-5 action." *Realmonte v. Reeves*, 169 F.3d 1280, 1285 (10th Cir. 1999); see also *Davidson v. Belcor, Inc.*, 933 F.2d 603, 606 (7th Cir. 1991) ("It is well-established that the exchange of shares during a merger transaction constitutes the purchase or sale of securities for the purposes of Section 10(b) and Rule 10b-5." (citations omitted)); *Gelles v. TDA Industries, Inc.*, 44 F.3d 102, 104 (2d Cir. 1994) ("[T]he simple exchange of shares in a merger qualifies as a purchase or sale when shareholders become shareholders in a new company as a result of * * * deception[.]" (citations and quotations omitted)). But the issue is not whether the acquisition of merger shares constitutes a purchase under federal securities law. Rather, the issue is whether the purchase occurred *within the Class Period*.

Given the impact that this issue may have on the relevant loss calculations, the Court requested supplemental briefing on the issue. Instead of addressing when the "purchase" of shares occurred, as requested by the Court, the NYC Fund notes that Kraft Heinz did not deliver the merger shares until July 6, 2015. [145, at 10.] Although investors may not have acquired stock in the newly formed Kraft Heinz until July 6, 2015, the NYC Fund admits that the effective date of the merger was July 2, 2015. [*Id.*] The NYC Fund further admits that "typically shares exchanges pursuant to a merger are considered 'purchased' on the effective day of the merger[.]" [145, at 10.] This position is supported by binding Seventh Circuit authority. *Colan v. Cutler-Hammer, Inc.*, 812 F.2d 357, 370 (7th Cir. 1987) (concluding that sale occurred when the merger closed). Still, the NYC Fund argues that the facts of this case are unique because the shares were not delivered to investors until July 6, 2015. While that certainly appears to be the case—at least with

10

respect to the investors before the Court—the NYC Fund fails to explain why that fact changes the Court's analysis.

The NYC Fund makes much of the fact that other movants, including the AP7/Union Group, included merger shares on their certifications. The AP7/Union Group responds that the PSLRA required that the AP7/Union Group disclose the fact that it received their shares from the merger on July 6, 2015, even if the shares were not purchased on that date. The PLSRA provides— in relevant part—that movants "set[ ] forth all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint." 15 U.S.C. § 78u-4(a)(2)(A)(iv). Although the Court questions whether the receipt of shares—versus the actual purchase of shares—qualifies as a transaction that must be disclosed under the PLSRA, the Court credits the AP7/Union Group's representation. In any event, without any basis for concluding that the date investors receive shares is the relevant date for calculating losses under the PLSRA, the Court concludes that the merger shares were purchased on July 2, 2015, the date the merger closed.

The NYC Fund also suggests that determining what constitutes the purchase date may necessitate the evaluation of subsequent discovery and expert opinions.[3] [145, at 11.] The NYC Fund therefore asserts that—for the purposes of determining the investor with the largest financial interest under the PSLRA—the Court should start the Class Period on July 2, 2015 to give effect to the intent of the *Iron Workers* complaint. For the purpose of calculating losses in determining the proper lead plaintiff in securities class actions, courts use the most inclusive class period. See *Hom v. Vale, S.A.*, 2016 WL 880201, at *4 (S.D.N.Y. Mar. 7, 2016) (finding "that the use of [a] longer, more inclusive class period is proper * * * because the longer class period encompasses

---

[3] The NYC Fund does not identify what additional discovery and/or expert testimony would be necessary for this analysis.

more potential class members and damages" and collecting cases); *In re Gentiva Sec. Litig.*, 281 F.R.D. 108, 113 (E.D.N.Y. 2012) (finding the most inclusive class period proper in analyzing lead plaintiff selection). Recognizing this legal standard, all remaining movants initially recognized that—based on the pleadings before the Court—the Class Period began on July 6, 2015.

The NYC Fund now takes the position that—if the Court were to conclude that the merger shares were purchased on July 2, 2015—the Court simply could expand the Class Period to begin on that date because the operative complaint (*i.e.*, the *Iron Workers* complaint) intended to include merger shares in the class definition. The Court questions whether it is clear that the *Iron Workers* complaint intended to include merger shares. The *Iron Workers* complaint only references one possible misrepresentation that occurred before the merger closed—statements made by in the April 10, 2015 preliminary registration statement and prospectus Form S-4 that Heinz filed with the SEC with respect to the shares of Heinz common stock to be issued to Kraft shareholders pursuant to the merger agreement.[4] [See Case No. 19-cv-1845, Dkt. 1 (*Iron Workers* Compl.), at ¶ 43.] However, the *Iron Workers* complaint makes clear that it is bringing claims based on purported "false and misleading misrepresentations and omissions during the Class Period." [*Id.* at ¶ 26.] And the Iron Workers complaint expressly identified July 6, 2015 as the start of the Class Period. [*Id.* at ¶ 1.] Indeed, under the operative pleadings before the Court, all remaining movants initially concluded that the Class Period began on July 6, 2015.

The NYC Fund argues that the Court has broad authority to modify the Class Period under Rule 23. While that certainly may be true as the case progresses, for the present purpose of calculating losses of competing lead plaintiffs the Class Period cannot be altered or corrected after the expiration of the 60-day notice period under the PSLRA. "The plain language of the statute

---

[4] It certainly is counter-intuitive that Heinz would make a misleading or fraudulent statement that would artificially inflate the purchase price of Kraft.

precludes consideration of a financial loss asserted for the first time in a complaint, or any other pleading, for that matter, filed after the sixty (60) day window has closed." *Topping v. Deloitte Touche Tohmatsu CPA*, 95 F. Supp. 3d 607, 619 (S.D.N.Y. 2015) (quoting *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 818 (N.D. Ohio 1999)) (internal quotation marks omitted). The Court therefore lacks authority to expand the Class Period to July 2, 2015 for the purposes of this motion and excludes merger shares from the relevant loss calculations.[5]

The next question is whether the Court will consider losses associated with shares sold before the alleged fraud was revealed. This issue relates primarily to calculating the losses of the AP7/Union Group. AP7 and Union are each made up of numerous separate funds. A number of Union's funds sold their Kraft Heinz positions before the disclosures alleged in the complaints. The Court agrees that these claimed losses properly are excluded from the AP7/Union Group's claimed losses. "[T]hose class members who sold their * * * common stock before * * * the first corrective price decline[ ] cannot be said to have suffered economic loss caused by [the] alleged fraud." *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 864-65 (7th Cir. 2014)); *see also Dura*

---

[5] Even if the Court were to include merger shares in its loss calculation, the Court would not appoint the NYC Fund as lead plaintiff under the facts of this case. Because such a substantial portion of the NYC Fund's claimed losses stem from merger shares, the Court concludes that the NYC Fund "is subject to unique defenses that render [it] incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). As outlined in the briefs of the other Remaining Movants, claims based on merger shares will be susceptible to unique arguments. [See, *e.g.*, 146, at 9-12.] For example, Defendant may argue that investors who received merger shares actually received a windfall through the merger, as the price of Kraft's stock skyrocketed following the announcement of the merger, and because Heinz also paid a special cash dividend to investors who purchased shares in the new company as a result of the merger. [*Id.* at 10; see also 86, at 13-15.] While the Court takes no position on the merits of these defenses at this time, they render the NYC Fund incapable of adequately representing the class. For this reason, the Court also concludes that the NYC Fund would not be an adequate representative of the class under Rule 23, as there is a substantial risk that it will become distracted by defenses unique to investors whose claims are based on merger shares to the detriment of the rest of the class. *J. H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980) ("The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer."). The Court recognizes that other investors also have claims based on merger shares. However, given that most, if not all, of the allegedly misleading statements occurred after the merger, these claims are not at the heart of this lawsuit.

*Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) ("[If] the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."); *Ullah Group. Alexandre Pelletier v. Endo International PLC*, 2018 WL 3035745, at *2 (E.D. Pa. June 19, 2018) (holding that losses incurred before any disclosure could not have been caused by the any disclosures and should not be included in the "'largest financial interest' calculus"); *Galmi v. Teva Pharm. Indus. Ltd.*, 302 F. Supp. 3d 485 (D. Conn. 2017) (reducing claimed losses to exclude losses not plausibly tied to any partial disclosure); *Sallustro v. CannaVest Corp.*, 93 F. Supp. 3d 265, 273 (S.D.N.Y. 2015) ("Therefore, when evaluating a plaintiff's financial interest for purposes of selecting a lead plaintiff, courts in this Circuit consider that plaintiff's recoverable loss, and do not take into account losses from shares sold prior to corrective disclosures." (collecting cases)).

Finally, the Court must consider whether the AP7/Union Group can aggregate their losses for the purposes of the lead plaintiff analysis. The NYC Fund and the Arca/Krupa Group argue that the AP7/Union Group should not be permitted to aggregate its losses because it is an artificial group. The NYC Fund further argues that the AP7/Union Group is not structured in an efficient manner to allow maximum recovery for the Class. Specifically, the NYC Fund challenges the fact that the AP7/Union Group "consists of two funds, eight declarants/signatories, and two law firms (Bernstein Litowitz and Kessler Topaz), across five cities and three countries (New York, Chicago, Radnor (Pennsylvania), Frankfurt, and Stockholm)." [88, at 14 (footnotes omitted).]

The Seventh Circuit has not yet addressed whether and to what extent the claims of class members can be aggregated for the purposes of determining which movant has the largest financial interest in the relief sought by the class. Although some courts have held that a group of investors must have a preexisting relationship to serve together as lead plaintiffs, see, *e.g., Sakhrani v.*

*Brightpoint, Inc.*, 78 F. Supp. 2d 845 (S.D. Ind. 1999), "the 'trend' has been to allow small groups of investors to act as lead plaintiff even if they do not have pre-existing relationships." See *Bang v. Acura Pharm., Inc.*, 2011 WL 91099, at *2 (N.D. Ill. Jan. 11, 2011) (citing *Sabbagh v. Cell Therapeutics, Inc.*, 2010 WL 3064427 at *4-5 (W.D. Wash. Aug. 2, 2010)). Furthermore, as the Supreme Court recently recognized, 80 percent "of securities class actions in post-PSLRA data sample had two or more co-lead counsel firms[.]" *China Agritech, Inc. v. Resh*, 2018 WL 2767565, at *7 n.3 (U.S. June 11, 2018) (citing Choi & Thompson, *Securities Litigation and Its Lawyers: Changes During the First Decade After the PSLRA*, 106 Colum. L. Rev. 1489, 1507, 1521, 1530 (2006)).

This trend is consistent with the Third Circuit's decision *In re Cendant Corporation Litigation*, which held that small groups of investors can aggregate their losses in computing the total loss amount and act as lead plaintiff even if they did not have any pre-existing relationship. 264 F.3d 201, 266-67 (3rd Cir. 2001). In reaching this conclusion, the Third Circuit reasoned that the PSLRA "contains no requirement mandating that the members of a proper group be 'related' in some manner[.]" See *id*. at 266. This Court therefore has concluded that—under the PSLRA— investors without a preexisting relationship can aggregate their claims for the purposes of determining which movant has the largest financial interest in the relief sought by the class. *Sokolow v. LJM Funds Management, Ltd.*, 2018 WL 3141814, at *3 (N.D. Ill. June 26, 2018).

Still, as the Court noted in *Sokolow*, "to enjoy the rebuttable presumption that the [PSLRA] statute confers, there must be some evidence that the members of the group will act collectively and separately from their lawyers." *In re Tarragon Corp. Sec. Litig.*, 2007 WL 4302732, at * 2 (S.D.N.Y. Dec. 6, 2007). In addition, "[a]t some point, a group may become too large for its members to operate effectively as a unit." *Aguilar v. Vitamin Shoppe, Inc.*, 2018 WL 1960444, at

*11 (D.N.J. Apr. 25, 2018) (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 267 (3d Cir. 2001)).

"Such unwieldiness would vitiate the PSLRA's purpose of having active and engaged plaintiffs supervise the conduct of the litigation * * * [T]he larger [the size of a proposed lead plaintiff group], the greater the dilution of control that [the members of that group] can maintain over the conduct of the putative class action." *Id*. (internal citations and quotations omitted); see also *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 815-16 (N.D. Ohio 1999) ("The greater the number of persons comprising the group, the more difficult it is for those persons to communicate with each other, and to speak with a single, coherent voice when making decisions about the conduct of the litigation, or, more precisely, the conduct of the attorney or attorneys in prosecuting the litigation.").

Courts consider the extent of the prior relationships between the parties as part of its analysis of whether the movant will adequately represent the interests of the class, but the parties' prior relationships alone should not be dispositive. *Cendant*, 264 F.3d at 266-67. Courts also look to other factors, such as the efforts of lawyers in creating a movant group to determine whether the resulting group could "be counted on to monitor counsel in a sufficient manner[,]" *id*. at 267 (citing *In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304, 307-08 (S.D.N.Y. 2001)), and the size of the movant group to determine whether that group can fairly and adequately represent the class. *Id*. at 267; see also *Sabbagh*, 2010 WL 3064427 at *5 (recognizing a group of investors should be "small and cohesive enough such that it can adequately control and oversee litigation") (citing *Eichenholtz v. Verifone Holdings, Inc.*, 2008 WL 3925289, at *8 (N.D. Cal. Aug. 22, 2008)). Whether a group can serve as lead plaintiff together should be determined on a case-by-case basis. *Cendant*, 264 F.3d at 267.

Based on all of the available information, the Court concludes that the AP7/Union Group is sufficiently cohesive to represent the interests of the class. To begin, the AP7/Union Group contains only two institutional investors who previously have worked together as co-lead plaintiffs in *In re Allergan Generic Drug Pricing Securities Litigation*, Case No. 16-cv-9449 (D.N.J.). There is no indication that these sophisticated institutional investors will be unable to operate effectively as a unit. See *Aguilar v. Vitamin Shoppe, Inc.*, 2018 WL 1960444, at *11 (D.N.J. Apr. 25, 2018) (concluding that group of three investors was "too small" to raise unwieldiness concerns). Furthermore, given the claimed losses by each of these investors, the Court concludes that each of these institutional investors can be counted on to monitor counsel in a sufficient matter. Accordingly, the Court will consider the aggregate losses of the Arca/Krupa Group in determining each of the movants' losses.[6]

Excluding claimed losses associated with merger shares and/or shares sold before the alleged fraud was revealed, the remaining lead plaintiff movants have the following financial losses:[7]

---

[6] The Arca/Krupa Group states, "because of the anticipated size and complexity of this action, Arca Krupa believes that a co-lead structure that includes Arca Krupa and the AP7/Union Group would be the most beneficial to the class." [86, at 7.] The Court finds this request puzzling, as the Arca/Krupa Group argues that the AP7/Union Group itself should not be permitted to aggregate their losses. In any event, the Court rejects the request by the Arca/Krupa Group, as the Arca/Krupa Group and the AP7/Union Group already have determined that they have divergent strategies. [86, at 8 n.6.]

[7] Because the NYC Fund and the AP7/Union Group do not provide loss calculations excluding merger shares and shares sold before the alleged fraud was revealed, the Court uses the loss calculations provided by the Arca/Krupa Group. [See 86, at 5.] According to the Arca/Krupa Group, the financial losses for each movant "was calculated by taking each movant's trading data and then, for each: (1) calculating the net cost of Kraft Heinz common stock purchased during the Class Period; (2) determining the net number of shares purchased during the Class Period that were retained as of February 21, 2019 (the "retained shares"); (3) calculating the movant's "current position" in Kraft Heinz by multiplying the number of retained shares by the average share price of Kraft Heinz common stock between February 22, 2019, and April 24, 2019 ($32.72 per share); and (4) subtracting the net cost from the current position." [86, at 15.] Furthermore, "[e]xcluded from the financial loss calculations are those constituent funds of Union and the NYC Fund that were either net sellers or in-and-out traders during the Class Period." [*Id.*] The NYC Fund fails to explain why these calculations are improper, nor does the NYC Fund provide calculations of its own

| Movant | Financial Interest |
|---|---|
| NYC Fund | $2,988,660.00-$5,128,987.00[8] |
| Arca/Krupa Group | $22,839,506.00 |
| AP7/Union Group | $24,789,508.00 |

[86, at 5.] The Court therefore concludes that the AP7/Union group has the largest financial interest in the relief sought by the class.

## C.     Rule 23 Requirements

The PSLRA further provides that the lead plaintiff must "otherwise satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u4(a)(3)(B)(I)(cc). Rule 23(a) provides that a party may serve as a class representative "only if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims and defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). The typicality and adequacy elements are the relevant factors to the appointment of a lead plaintiff. *Hospira*, 2012 WL

---

excluding merger shares (presumably recognizing that they do not have the largest financial interest in the relief sought by the class if such losses are excluded). The Court therefore must rely on the Arca/Krupa Group's calculations.

[8] As discussed below, Movants submitted numerous post-briefing submissions relating to the NYC Fund's losses related to commingled funds. For the purposes of this analysis, the Court assumes that the NYC Fund can included such losses in its loss calculation. The NYC Fund contends that approximately $2,140,327 million of its losses are related to commingled funds. [98, at 14.] However, it is unclear to the Court whether and to what extent the loss calculation of the Arca/Krupa Group includes losses related to commingled funds. The Court also recognizes that the NYC Fund's $2.14 million calculation is based on the NYC Fund's overall loss calculation, which the Court has concluded is overstated. The Court therefore lists the NYC Fund's losses as a range from $2,988,660.00 (the Arca/Krupa Group's calculation) to $5,128,987 (the Arca/Krupa Group's calculation plus $2,140,327 million). Again, for the purposes of the Court's loss analysis, the Court assumes that the NYC Fund's losses are at the top of that range ($5,128,987.00).

1339678, at *8.  The AP7/Union Group has satisfied its burden by making a preliminary showing that it satisfies the requirements of Rule 23.

Under Rule 23(a), a plaintiff's claims are typical if they "arise[ ] from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory."  *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998).  Here, for purposes of selecting the lead plaintiff, the AP7/Union Group's claims are based on the same legal theories and arise from the same events and course of conduct giving rise to the claims of the other class members in this case.  As such, it meets the typicality requirement of Rule 23(a).  See *Johnson v. Tellabs*, 214 F.R.D. 225, 228 (N.D. Ill. 2002).

The AP7/Union Group also meets the adequacy requirement in Rule 23(a).  "A lead plaintiff meets the adequacy requirement if (1) its claims are not antagonistic or in conflict with those of the class; (2) it has sufficient interest in the outcome of the case to ensure vigorous advocacy; and (3) it is represented by competent, experienced counsel who [will] be able to prosecute the litigation vigorously."  *Hospira, Inc.*, 2012 WL 1339678, at *8 (citing *Tellabs*, 214 F.R.D. at 228-29).  Movants Timber Hill and the Chesson Group argue that the AP7/Union Group—and any other movant with claims based on common stock purchasers—cannot adequately represent class members with claims based on investments in the derivatives market.  Thus, both Timber Hill and the Chesson Group both independently seek appointment as co-lead plaintiff to represent the interests of investors in the derivatives market.

According to Timber Hill and the Chesson Group, although the Remaining Movants may have a greater financial interest in the relief sought be the class, the Remaining Movants will not adequately represent the interests of investors in the derivatives market.  In so arguing, Timber Hill and the Chesson Group note that stocks and derivatives are valued differently and may require

separate expert analysis to determine damages. They further note that derivatives investors may have to take on substantive fights that stock investors do not and will have to present different proof to support their claims. Movant Timber Hill also notes that the damages cap imposed by Section 20A creates a fundamental conflict between common stock investors and derivatives investors, because common stock investors will have the incentive to downplay the damages of derivative investors to preserve more of the limited pool of damages for common stock investors.

Although movants Timber Hill and the Chesson Group identify potential conflicts of interest, these conflicts are merely speculative and hypothetical at this stage of the case. This case therefore is unlike *In re Allergan, Inc. Proxy Violation Derivatives Litigation*, in which the court appointed Timber Hill as lead plaintiff for a derivates class in a separate derivatives class action. [Case No. 2:17-cv-04776 (C.D. Cal. Aug. 13, 2018), Dkt. 63.] In that case, counsel conceded that they were forfeiting arguments available to investors in the derivatives market to benefit common-stock lead plaintiffs. [See 92-4.] However, any conflict of interest in this case remains speculative and therefore does not justify separate representation. See *Smith v. State Farm Mut. Auto. Ins. Co.*, 301 F.R.D. 284, 290 (N.D. Ill. 2014); see also *Aronson v. McKesson HBOC, Inc.*, 79 F. Supp. 2d 1146, 1151 (N.D. Cal. 1999) ("[T]he existence of different pleading standards does not create the need for a separate lead plaintiff.").

The Court notes, however, that the AP7/Union Group has a responsibility under the PSLRA to continue to monitor whether its members are capable of adequately protecting the interests of class members. *In re NYSE Specialists Sec. Litig.*, 240 F.R.D. 128, 133 (S.D.N.Y. 2007) ("Courts have interpreted their lead plaintiff responsibilities under the PSLRA to encompass a continuing 'duty to monitor whether lead plaintiffs are capable of adequately protecting the interests of the class members.'" (quoting *In re Terayon Commc'ns Sys., Inc. Sec. Litig.*, 2004 WL 413277, at *7

(N.D. Cal. Feb. 23, 2004))). Thus, a lead plaintiff has the "responsibility to propose their own withdrawal and substitution should it be discovered that they may no longer adequately represent the interests of the purported plaintiff class." *Id.* (citing *In re Initial Pub. Offering Sec. Litig.*, 2004 WL 3015304, at *1 (S.D.N.Y. Dec. 27, 2004)). If any lead plaintiff fails to do so, "a member of the purported class will be allowed to endeavor to protect its own interests and the interests of its fellow class members by similarly moving the court to have a lead plaintiff removed upon good cause shown." *Id.*; see also *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 541 (S.D.N.Y. 2015) ("If pre-trial discovery reveals rifts within the class that require subclasses, the issue will be addressed at that time." (citations omitted)). Given the many qualified potential lead plaintiffs and counsel who have come forward at this initial stage of the case to offer their services, lead plaintiff and counsel undoubtedly will be carefully monitored going forward, both externally and by the Court itself, to ensure that no unaddressed conflicts arise. The Court is not, however, persuaded to disregard the presumption established by the PSLRA based on speculative future conflicts. The Court therefore concludes that the AP7/Union Group alone is presumed the most adequate plaintiff under the PSLRA.

## D. Rebuttable Presumption

The presumption established by the PSLRA "may rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff (aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C.A. § 78u-4(a)(3)(B)(iii)(II). The NYC Fund argues that the AP7/Union Group already has failed to exercise appropriate oversight over their counsel, demonstrating that they will not fairly and adequately protect the interests of the class. In support of that assertion, the NYC Fund cites to

the fact that attorneys for the AP7/Union Group announced to the Court that they were going to seek appointment as co-lead plaintiffs with the Arca/Krupa Group, but then changed course before filing its opposition brief. However, the Court sees no problem with movants attempting to resolve competing lead plaintiff motions.[9] See *Sokolow*, 2018 WL 3141814, at *3 (appointing co-lead plaintiffs who initially moved separately for appointment as lead plaintiff). Representatives of AP7 and Union submitted a joint declaration outlining their existing relationship and representing that they "each independently determined to seek joint appointment as Lead Plaintiff." [60-2.] The joint declaration also outlines their ability to monitor counsel and their incentive to maximize recovery for the class. [*Id.*] The representatives also submitted a supplemental declaration indicating that discussions to combine with the Arca/Krupa Group were done under their oversight. [98-1.] Based on the representations in these declarations, the Court has no reason to question the AP7/Union Group's ability to fairly and adequately protect the interests of the class.

The NYC Fund also argues that the AP7/Union Group is presumptively barred from becoming lead plaintiff. The PSLRA's "professional plaintiff" provision provides:

> Except as the court may otherwise permit, consistent with the purposes of this section, a person may be a lead plaintiff, or an officer, director, or fiduciary of a lead plaintiff, in no more than 5 securities class actions brought as plaintiff class actions pursuant to the Federal Rules of Civil Procedure during any 3-year period.

15 U.S.C. § 78u-4(a)(3)(B)(vi) (the "5-in-3 provision"). The NYC Fund argues that the AP7/Union Group violates this prohibition because its members have been appointed lead plaintiff in eight securities actions in the last three years, with Union alone having been appointed lead plaintiff in seven class actions in the last three years. [60-1, at 5, ¶ 6.]

---

[9] The NYC Fund also notes that Kessler previously represented the Iron Workers Plan in connection with the Iron Workers complaint. However, the NYC Fund fails to explain why this shows that the AP7/Union Group is unable to exercise appropriate oversight of their counsel.

The AP7/Union Group responds that the 5-in-3 provision does not apply to institutional investors and therefore does not preclude its members from acting as co-lead plaintiffs. Although the 5-in-3 provision does not expressly exclude institutional investors from its scope, it gives the Court discretion to waive the provision when "consistent with the purposes of [the PSLRA]." 15 U.S.C. § 78u-4(a)(3)(B)(vi). The text of the statute thus allows the Court to make exceptions to the 5-in-3 provision consistent with the purposes of the PSLRA. As many courts have noted, that provision "was largely directed at private individuals" and courts thus "have routinely waived the restriction in the case of qualified institutional investors." *Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC*, 616 F. Supp. 2d 461, 467 (S.D.N.Y. 2009) (collecting cases). In short, the PSLRA reflects a "presumption that institutional investors be appointed lead plaintiff." *Greebel v. FTP Software, Inc.*, 939 F. Supp. 57, 63 (D. Mass. 1996).

Regardless of whether institutional investors categorically are excluded from the 5-in-3 provision, the Court concludes that allowing the AP7/Union Group to serve as lead Plaintiff is consistent with the purposes of the PSLRA in this case. To begin, as discussed above, the AP7/Union Group has the largest financial interest in the relief sought by the class. Although other movants are institutional investors, the Court has concerns regarding the adequacy of these movants to fairly and adequately protect the interests of the class. With respect to the NYC Fund, its claimed financial interest in the relief sought by the class is overstated because it improperly includes merger shares and is actually much lower than the relief sought by the AP7/Union Group.

The NYC Fund has raised concerns about the Arca/Krupa Group's ability to serve as lead plaintiff. Specifically, the Czech National Bank ("CNB") denied a request by Pavol Krupa—the Arca Krupa Group's current principal and signatory of the certification in this case—to be appointed a member of the Board of Directors of Arca Capital CEE. [See 88-6.] In denying the

request, the CNB concluded that it "does not have a reason to expect that [Mr. Krupa] could duly exercise the office of an executive of a self-governed investment fund and to properly comply with all the duties of such an executive arising from the valid legal regulations." [*Id*. at 10.] This conclusion was based on Mr. Krupa's role in conduct leading to sanctions against Arca Capital Global Equity, a.s., and Arca Investments, a.s. [*Id*.] Although there is no indication that the errors leading to sanctions benefitted Mr. Krupa, the CNB concluded that Mr. Krupa personally was responsible for the errors. [*Id*. at 8.] The CNB also questioned Mr. Krupa credibility because he "provided false information by failing to provide information" information about a sanction as requested in a questionnaire. [*Id*. at 9-10.]

The Arca/Krupa Group attempts to explain this omission as a good faith mistake, but that is not how the CNB saw it. Even cases cited by the Arca/Krupa group recognize that "honesty and trustworthiness are relevant factors in assessing a candidate's ability to serve as an adequate fiduciary for a class[.]" See *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. LaBranche & Co.*, 229 F.R.D. 395, 416 (S.D.N.Y. 2004) (citing *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998)); see also *Searcy v. eFunds Corp.*, 2010 WL 1337684, at *4 (N.D. Ill. Mar. 31, 2010) ("The honesty and credibility of a class representative is a relevant consideration when performing the adequacy inquiry 'because an untrustworthy plaintiff could reduce the likelihood of prevailing on the class claims.'" (quoting *Roe v. Bridgestone Corp.*, 257 F.R.D. 159, 168 (S.D. Ind. 2009)); *Kaplan v. Pomerantz*, 132 F.R.D. 504, 510 (N.D. Ill. 1990) ("A plaintiff's honesty and integrity are important considerations in allowing him to represent a class." (citing *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 549 (1949); *Armour v. City of Anniston*, 89 F.R.D. 331, 332 (N.D. Ala. 1980)). Given this history, appointing the ARCA/Krupa Group's as lead plaintiff over the AP7/Union Group is not consistent with the purposes of this PSLRA.

E.	**Lead Counsel**

"The PSLRA provides that the lead plaintiffs shall, subject to Court approval, select and retain counsel to represent the class they seek to represent." *Hospira, Inc.*, 2012 WL 1339678, at *9 (citing 15 U.S.C. § 78u–4(a)(3)(B)(v)); see also *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 540 (S.D.N.Y. 2015) ("The PSLRA vests authority in the lead plaintiff to select lead counsel, subject to approval by the Court." (citing 15 U.S.C.A. § 78u-4(a)(3))).  The AP7/Union Group has selected and retained Kessler Topaz and Bernstein Litowitz to serve as lead counsel.

The NYC Fund challenges the AP7/Union Group's choice of co-lead counsel, arguing that the choice of two law firms to serve as co-lead counsel inevitably will lead to duplication of work and excess fees.  "[T]he Court should not disturb the lead plaintiff's choice of class counsel unless 'necessary to protect the interests of the class.'"  *Id.* (quoting *In re Nortel Networks Corp.*, 2002 WL 1492116, at *1 (S.D.N.Y. Feb. 4, 2002) (internal quotation marks omitted)).  Although courts have rejected requests to appoint more than one law firm to act as lead counsel when doing so was necessary to protect the interests of the class, see, e.g., *id.* (rejecting request to appoint co-lead counsel where the lead plaintiff initially determined that one law firm was sufficient and there was no reason to disturb that initial assessment at the risk of additional costs); *Weltz v. Lee*, 199 F.R.D. 129, 134 (S.D.N.Y. 2001) (rejecting proposal to appoint one law firm as lead counsel and chair of an executive committee, other law firms to serve as members of the executive committee (with one of those firms also serving as liaison counsel) and fifteen other law firms as proposed executive committee members).  Here, there is no indication that rejection of the AP7/Union Group's choice of co-lead counsel is necessary to protect the interests of the class in this case.  Even the cases cited by the NYC Fund note that more complex legal representation might be appropriate in more complex cases.  *Weltz*, 199 F.R.D. at 134 ("The instant action, in contrast [to cases approving more

complex counsel appointments], involves a single misrepresentation in connection with a single transaction and is not so unduly complex as to justify such a structure.").  This case is not so simple as to justify disturbing lead plaintiff's choice of lead counsel.

Given the extensive experience both of these firms have in the area of securities law, the Court approves them as co-lead counsel in this case.  The Court recognizes, of course, its responsibility to carefully scrutinize any fee award sought in this case by co-lead counsel.  See 15 U.S.C. § 78u–4(a)(6) (limiting the total award of attorneys' fees and expenses to "a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class"); see also *Hospira*, 2012 WL 1339678, at *9 ("The parties are on notice, however, that the Court will carefully scrutinize any proposed fee award and will not hesitate to reject such an award if it proves to be unreasonable, especially given that two counsel are being appointed as lead counsel." (citations omitted)); *In re Sprint Corp. Sec. Litig.*, 164 F. Supp. 2d 1240, 1244 (D. Kan. 2001) ("Co-lead counsel are hereby on notice that the court will not approve any possible award of fees and expenses that reflects duplication, inefficiency, or the costs of coordinating the efforts of the two firms.").  And the Court certainly will do so in this case.  Consistent with the foregoing discussion, the Court appoints Kessler Topaz and Bernstein Litowitz to serve as co-lead counsel.

### F.    Motions to Seal and Motion for Discovery

The NYC Fund filed a motion [103] to seal certain portions of its reply brief in support of its appointment as lead plaintiff.  In support of that motion, the NYC Fund contends that its reply brief includes financial data beyond that mandated to be disclosed by the Private Securities Litigation Reform Act.  The NYC Fund further contends that the information constitutes confidential trade secrets, proprietary business information, and non-public client information concerning the NYC Fund's finances and trading.  The redacted materials were provided in

response to the argument by the AP7/Union Group that the NYC Fund lacks standing to assert claims on shares purchased through commingled funds.

The AP7/Union Group in turn moved for discovery on that issue. [See 106.] The AP7/Union Group also filed a motion [112] to seal its memorandum [108] in support of that motion [106]. In that motion, however, the AP7/Union Group indicates that it is filing its memorandum under seal only because it references the materials that the NYC Fund filed under seal. [See 112, at ¶ 1.] The AP7/Union Group also filed a motion [114; 115] for leave to file a sur-reply to address arguments that it contends that the NYC Fund raised for the first time in its reply brief. The AP7/Union Group also filed a motion to seal its motion [117] for leave to file a sure-reply only because it referenced materials that the NYC Fund filed under seal. The NYC Fund then filed its response [123; 124] to AP7/Union Group's motion for discovery along with a motion [125] for leave to file under seal. The AP7/Union Group also filed a motion [129] to seal its reply in support of its motion for discovery. The Arca/Krupa Group filed a memorandum [119] in support of the AP7/Union Group's motion to conduct limited discovery. In that memorandum, the Arca/Krupa Group notes, however, that the motion for discovery becomes moot if the Court determines that merger shares should not be included in the NYC Fund's losses. [119, at 3.]

The NYC Fund then filed a motion [130] to take judicial notice of the master agreement between the New York City Law Department and Kessler Topaz Meltzer & Check, LLP dated February 8, 2019. The AP7/Union Group filed its response [132; 133] and a motion to seal its response [134].

The Court begins by addressing the AP7/Union Group's motion for discovery [106]. The Court agrees with the Arca/Krupa Group's assertion that the motion for discovery becomes moot if the Court determines that merger shares should not be included in the NYC Fund's losses. [119,

at 3.]  "Discovery may be had on the issue of the adequacy of the presumed lead plaintiff only upon a showing of a reasonable basis for finding that the presumptive most adequate plaintiff cannot adequately represent the class."  *Piven v. Sykes Enterprises, Inc.*, 137 F. Supp. 2d 1295, 1307 (M.D. Fla. 2000) (citing 15 U.S.C. § 78u-4(a)(3)(B)(iv)).  As discussed above, if the NYC Fund's merger shares are excluded from the loss calculation, the NYC Fund is not the presumed lead plaintiff.  Accordingly, the Court denies the AP7/Union Group's motion [106] for discovery.

The Court in turn denies the NYC Fund's motion to take judicial notice of the master agreement between the New York City Law Department and Kessler Topaz Meltzer & Check, LLP dated February 8, 2019 [130] as moot because the NYC Fund presented the document in connection with the motion for discovery.  The Court also denies the AP7/Union Group's motion for leave to file a sur-reply to address arguments that it contends that the NYC Fund raised for the first time in its reply brief [114; 115] as moot because the sur-reply is not necessary to the Court's resolution of the competing motions.

That leaves the remaining motions [103; 112; 117; 125; 129; 134] to seal.  As noted above, although the AP7/Union Group filed some of these motions to seal, they only did so because their submissions included materials that the NYC Fund contends should remain under seal.  Specifically, the NYC Fund seeks to seal materials purporting to contain information that constitutes confidential trade secrets, proprietary business information, and non-public client information concerning the NYC Fund's finances and trading.  The NYC Fund also seeks to seal materials purporting to contain privileged information.

Both the Federal Rules of Civil Procedure and this Court's Local Rules permit the filing of documents under seal for "good cause."  See Fed. R. Civ. P. 26(c)(1); N.D. Ill. L.R. 26.2(b).  Although sealing is permitted under circumstances, the Seventh Circuit has described "[t]he

public's right of access to judicial records" as "fundamental to a democratic state" and that the "presumption [of public access] is of constitutional magnitude." *Matter of Cont'l Ill. Sec. Litig.*, 732 F.2d 1302, 1308 (7th Cir. 1984). The Court therefore has an "obligation to determine whether good cause exists to seal documents, or portions thereof, from the public record." *Camilotes v. Resurrection Healthcare*, 2012 WL 2192168, at *4 (N.D. Ill. June 14, 2012) (citing *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999)). The "property and privacy interests" of litigants can override the public's "interest in what goes on at all stages of a judicial proceeding" only when the litigants' interests "predominate in the particular case." *Citizens First Nat. Bank of Princeton*, 178 F.3d at 945. "If there is any doubt as to whether the material should be sealed, it is resolved in favor of disclosure.*" In re Bank One Sec. Litig.*, 222 F.R.D. 582, 586 (N.D. Ill. 2004).

To the extent that the NYC Fund's redactions are made to protect investment strategies beyond strategies that are common industry knowledge, the Court agrees that sealing the NYC Fund's unredacted submissions may be appropriate. However, after an initial review of the materials redacted, the Court is not satisfied that the NYC Fund's redactions are so limited. The Court recognizes that the NYC Fund only redacted a small portion of its submissions, but that does not relieve the Court of its obligation to determine whether good cause exists to seal those portions of the NYC Fund's submissions. Although the Court leaves open the possibility that there is good cause to seal portions of the NYC Fund's submissions (*e.g.*, portions of the declaration of Alan H. Kleinman discussing strategies), some of the redactions clearly are not supported by good cause. For example, the NYC Fund asserts that only $2,140,327 of its claimed losses are losses from comingled accounts. The Court also questions whether broad and well-known investment strategies—such as whether a certain strategy results in economies of scale—should be sealed

under the good cause standard. Given the number of pending motions to seal—and the fact that the NYC Fund also seeks to file documents under seal on privilege grounds—the Court will refer the remaining sealing issues to the assigned magistrate judge for resolution.

## IV. Conclusion

For the reasons set forth above, the Court consolidates the above-captioned cases. The Court further grants the lead plaintiff motion of the AP7/Union Group [57] and approves the selection of Kessler Topaz Meltzer & Check, LLP and Bernstein Litowitz Berger & Grossmann LLP as co-lead counsel. The Court denies the remaining lead plaintiff motions [46; 49; 52; 61] in full. The AP7/Union Group's motion [106] for discovery, the AP7/Union Group's motion [114; 115] for leave to file a sur-reply, and the NYC Fund's motion [130] to take judicial notice are denied as moot. The motions to seal [103; 112; 117; 125; 129; 134] will be referred to a magistrate. The case is set for further status on October 22, 2019 at 9:00 a.m.


Dated: October 8, 2019

_____
Robert M. Dow, Jr.
United States District Judge